Good morning, everyone, and welcome and thank you for your patience this morning. We're now ready to call the first case, which is Laborers' Pension Fund v. W.R. Weis Company, case numbers 16-2079 and 16-2944. Correct. You may proceed. Karen Englehart, I represent the Laborers' Pension Fund and James S. Jorgensen. The fund is seeking a reversal of the district court's decision affirming the arbitrator denying withdrawal liability to the fund. This case involves an interpretation of the construction industry exemption under the Multi-Employer Pension Plan Amendments Act. The court is required to perform a de novo review of the interpretation of the MEPA statute and of Section 1383B. Is it really a statutory interpretation case? I viewed it more as a contract interpretation case. You've got a series of interlocking documents here in addition to the global CBA. I think I can answer that. Okay. The section of the construction industry exemption talks about the continue to perform the work in the jurisdiction of the collective bargaining agreement of the type of which contributions were previously required. In this case, the withdrawal assessment involved years of laborers' work. The hours were reported to the fund. The withdrawal liability in this case is an amount of uninvested but unfunded pension liability. These people were laborers. They worked for this particular company. Their hours were reported and paid to the fund. Eventually, the company withdrew from the collective bargaining agreement. The fund assessed the amount owed and determined that $619,209 was owed. That amount is the underfunded portion for laborers. Now, contributions are collected on a monthly ongoing basis. This has nothing to do with contributions collected on a monthly basis. It has nothing to do with finishers' hours or contributions for finishers. These are laborers' contributions. And because withdrawal liability protects funds, it was passed in 1980 to make sure that participants who deserve a pension that had incurred hours and pension credits will get their pension. The fund, now, if the liability isn't paid, all the other employers in the fund will have to bear the burden of making sure that the underfunding… Right. Well, I understand the practical effect here, which is what you are describing. But my question was really directed at whether there really is an issue of statutory interpretation in this case. I don't see it. The question is whether under the interlocking set of contracts that apply here, the work was of the type for which contributions were previously required. That was the foundation of the arbitrator's decision. Well, if you look at who they look at as previously required, since the underfunding is previously required contributions, then contributions for the underfunding… the underfunded is the previously required piece, then the question is whether the work continued. And if the work continued, then the statute can be interpreted that according to the facts that are stipulated, the work did continue and the withdrawal liability is owed. And the statute is ambiguous because if you look at the portion of continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required. The type for which contributions were previously required refers to those labor's contributions that form the basis of the underfunding. And in that case, then the work did continue. And the reason for that interpretation is really the basis of the construction industry exemption, which talks about when an employer ceases work, it would harm the plan if the work doesn't go to other employers. If that employer stopped work and other employers came in and picked up the bidding of the jobs for stone that the Weiss company performed, they may have hired laborers and paid laborers to do the work. But in this case, Weiss himself said, well, the work continued, but we had finishers do the work. We like finishers better. Ms. Engelhardt, can I ask you to tell us a little more than the stipulation does about the facts about the work that was done by laborers before 2009 and done by finishers after 2009? Well, the laborers' work involved tending to stonemasons in the exterior portions of the job. So it's outside work? Laborers never did interior work. Correct. And primarily, finishers did do the interior work. But at one point, somewhere along the line, Weiss moved some finishers outside. And then finishers were tending to the masons who were doing the stone hanging, as well as laborers. And they worked together, side by side. Now, did that cause a jurisdictional dispute? I would think ordinarily it would. Well, that's the union side. Right. As a fund, I know there may have been some talk about jurisdictional dispute, but nothing was ever adjudicated in this case. Okay. Well, but something got worked out, presumably. Well, I'm not sure it ever got worked out to the satisfaction of the laborers' union, but it moved on. And the laborers then do the paving. They did the stone work for fountains. They laid the pavers in front of buildings and did the unloading and loading of stone. But in terms of type of work, I mean, inside and outside, at least, is a distinction that's fairly easy to understand in the pre-2009 days. Correct. And then I take it your position is that when Weiss stopped hiring laborers, it relied on marble finishers to do the outside stone work. Correct. That had been done before. And that's, quote, the type of work for which contributions had previously been required. That's correct. Is there anything in the statute, the exemption requirement about it continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required, anything in there that makes this issue depend upon who did the work, the identity of the person doing the work, or is it just the type of work? I think it's just the type of work. That's what the arbitrator said. Well, the arbitrator said the work is dispositive. That was what the arbitrator ruled, and that was confirmed by the court. And that would be the same. As I see it, you think the result should be the same if the work is shifted to non-union employees or to a different union, right? It's still a withdrawal. I think what's helpful is the H.C. Elliott v. Carpenters Pension Fund case. And I think that case looked at a little bit different situation, which involves subcontractors, which wasn't our situation. So there was even a more difficult pill to take for the employer to be bound by the agreement, which the employer withdrew from that obligated them to hire union subcontractors. But in any event, rather than going in their case, that court set up and really discussed the details of how the statute should work in the situation. And they say, well, one question is whether the employer ceases to have an obligation to contribute under the plan, which in this case was agreed. And then the second question is the employer either does or does not continue to perform the work. And I think they called this the bright line test. And it's at the end of the opinion that's out very clearly that it's important to make that distinction. And I think going back and talking a little bit about the fund has a policy that seemed to have gotten involved in this. And the fund's policy with respect to whether people are of one trade or another and how we collect on them got involved in the question of withdrawal liability. And that policy says that when the employer has designated someone as a finisher and been paying the finisher's fund, the labor's fund does not bang an employer twice. Technical term. Technical. We don't double dip. But it works here. We don't double dip. But it works here. And it's a reasonable policy not to put many employers have so many overlapping trades that electricians overlap with laborers, operating engineers, millwrights, carpenters, finishers, cement finishers, and teamsters. So that it makes sense to not pursue the covered work when another trade is doing it from the fund's point of view. This is not what the union would do. But the funds take that, establish that position. And that was what the district court seemed to rely on in making the decision of what was going on with the collective bargaining agreement when really the question is whether the work is continued. And the work is continued. There is no dispute about that. Those are undisputed facts. And I think if these decisions are allowed to stand and the policy considerations should be considered here. And one is that employers will self-select maybe which fund to pay into based on maybe the withdrawal liability of one fund over another. And then the other more important consideration is that transferring the work puts us at a position where we need to change the policy. The fund will then have to go out on the job sites, make investigations about who's doing what work, and collect for everybody who's picking up a shovel that may have some overlap. And I think it's important to consider these policy opportunities or of what would happen if the district court's decision allowed to stay. Thank you. Certainly. Thank you. Mr. Gale. Because Weiss, the arbitrator, and Judge Chang were all correct that the construction exemption applies, the merits decision below should be affirmed. And because the fund forfeited the only argument that conceivably could have escaped clearer review by failing to present it to the arbitrator, the decision denying Weiss's entitlement to prevailing party fees should be reversed. May it please the court, my name is Lenny Gale, and I represent W.R. Weiss. In court today we have Karen Weiss and her son Peter Weiss. Peter was the company representative throughout the arbitration and provided testimony about the Weiss business, the construction industry, and in particular provided the testimony that led the arbitrator to conclude  was stopped because of statements in a continued course of conduct that it had and conveyed to the Weiss's that the collective bargaining requirements to pay pension fund contributions were met, that the statutory element was met. That's what the fund said in its audits. The MPPAA requires that an arbitrator resolve all withdrawal liability disputes and specifies that that decision is subject to deferential review. The parties here arbitrated withdrawal liability. A two-day hearing with a half a dozen live witnesses. That hearing followed a year of pretrial document discovery and deposition discovery, and that hearing was followed by extensive post-trial briefing, over 100 pages that ended up including the union's sir, sir reply. Weiss prevailed and the fund lost, and it lost on two independent grounds. First, the contributions had not been previously required. That is an element separate from Your Honor's questions on jurisdiction. There were two elements that were tried in the arbitration. We believe the arbitrator got the first one wrong, but we didn't appeal it, which is the work jurisdiction question, but we didn't appeal it because of clear air review. The second element on the contributions were not previously required is what the arbitrator held and what the district court found here. And then second, the arbitrator held that even if funds, even if the previously required element was somehow met, the fund itself was stopped by a 10-year course of conduct from enforcing those rights against Weiss. At that point, after the arbitration. But in terms of that argument of a stop argument, I don't understand, Counsel. I understand your argument on the post-withdrawal audit comments, but the fund is not trying to get withdrawal liability for a single hour that marble finishers worked, is it? Oh, well, it's the premise for its assertion of withdrawal liability. Its argument is that finishers' work was within the jurisdiction and contributions were required for it. No, no, no. They're not saying that. They're saying that this has been looked at backwards, I think. The question is what work were the laborers doing before the withdrawal for which contributions were required? Bear with me, please. Sure, of course. That's the perspective from the statute. What work was shifted away from the fund here? And where did that work go? And it sure looks like it went to the finishers' union. I'm sorry, Your Honor. So this looks like a fairly simple problem to me, at least as long as we can draw a line and identify what work the laborers were doing that they stopped doing. Your Honor, I believe two things about what the Court's line of thinking suggests. One is it marries a two-element statutory question into one. The question about whether contributions were previously required for laborers is a tautology. Once you establish element one in the statute that the work is in the jurisdiction, then contributions were required. No, it's not a tautology because of the extent of overlapping jurisdictions with different trade collective bargaining agreements, which are written broadly enough that you're going to have these kinds of disputes that get worked out one way or another. And so the question is, first, was it within the scope of the CBA in the jurisdiction? The answer, yes. They were working for your client within the jurisdiction, doing work within the jurisdiction of the laborers' CBA. And were contributions required for it? Well, yes. Not when other unions were doing it. Then they weren't requiring it. But that's why I think this seems like a pretty simple problem. Well, let me address that, and let me make the second point. What I do think Your Honor has just portrayed is that as night follows day, once the jurisdictional decision that Your Honor put, once the fund established, which we stipulated, as the Court knows, that in fact some finishers pushed brooms, unloaded trucks, that doesn't end the previously required question. That establishes at best in our mind the jurisdictional question. Were contributions previously required for pushing brooms and cleaning up the stone? But Your Honor, there was a period, for example, and I'm hearkening back to a question you asked counsel a moment ago. Before Wyss stopped employing laborers, there was a period where they employed them both. And I'll give you an archetype. At the Art Institute of Chicago, the beautiful, the new wing, I'm forgetting the architect. They, Wyss employed setter and finisher pairs, and it employed laborer and bricklayer pairs side by side doing identical work. During that period of time, Wyss paid contributions to the laborer's pension fund just for the bricklayers and the laborer pairs. It did not pay contributions for the finishers. Right. It was audited. The question was by the fund. The fund commissioned the audit, by the way. It's not the union. The fund audited whether Wyss's contributions were correct. And let's pause for a second. The audit was whether Wyss's obligations under the laborers' collective bargaining agreement were being discharged. And what did the fund and its auditors say? Yes. If you look at the language, it's remarkable. It says you've paid everything. The contribution requirements have been sufficed. Wyss owes nothing. And that governed the period when they were doing identical work side by side. So when we go back to Estoppa, which is, I think, how we got on to this question, the union has a policy that the fund adopted and implemented and enforced. It said when laborers are doing the work, you pay, and when a member of another union is doing the work, you don't pay. The non-union distinction in H.C. Eliot actually proved our point. In H.C. Eliot, the courts, the Ninth Circuit, looked at the collective bargaining agreement. And because the collective bargaining agreement made the employer responsible for contributions for non-union employees, they were on the hook, which gets to the primacy of your honors, of Judge Seng's question right at the beginning, which is this has to do with what does the collective bargaining agreement say? In H.C. Eliot, the collective bargaining agreement said something that resulted in contributions being required. In our case, as Judge Chang ruled, and as the fund has never joined, the interlocking contracts are ambiguous. And so what you do is you look at the course of dealing between the parties, and that course of dealing in this case is extensive, it's decade-long, and it's undisputed. One, you have the laborer's fund's representative testifying on cross-examination that we have a policy, a policy that's consistent with the discretion the fund gets in the very declaration of trust on which the fund relies, that we can interpret our agreement. We can interpret for whom contributions are required. And you heard in the arbitration the representative of the union stand up and say, we are discharging our obligations in a way that requires contributions for laborers but does not require contributions for members of other unions. That was their discretion and implemented. So in the exercise of discretion there, how did Wyss decide which union workers did which work? Wyss decided that finishers, Wyss's business was moving to what's called lower podium work, where the eyes were closer to the work, and so it was higher quality work. It was more crafty. It was more difficult work. Finishers could do that difficult work. Finisher and setter pairs did that difficult work. In fact, the record contains an example of where we tried to use laborers and bricklayers to do the work. It got grieved, and we had to bring in setters and finishers to complete the job. This was on Jackson, 175 West Jackson. But back to the court's question. And so what Wyss decided after the Art Institute job, which I described, was we can employ these setter and finisher pairs to do where our business is going, which is this higher craft work, and where there is still cleanup to be done, where you still have to unload a truck, the setters can do it. Which is outside work in essence? I heard earlier that there was sort of an inside-outside distinction. Was that true? That was their argument, and we litigated it to the nth degree. I think the arbitrator never reached it. The arbitrator just said, look, these tasks overlap. She even used the word arguably. But the Art Institute, Your Honor, is clear. They're both outside. They would have contended before that evidence came out. I'm concerned that the arbitrator short-circuited a more fundamental question by this somewhat surprising statutory interpretation. And with respect to the waiver issue that you all have raised. Yeah, forfeiture. In the union's post-arbitration brief, they wrote, this is in Supplemental Appendix 115, they wrote, similarly under the MPPAA, assigning the work to a different trade does not change the work. The work remains the same. The identical tasks continue to be laborers' covered work, albeit not performed by laborers. The work cannot be identified by the union employee doing the work, and so on and so forth. That looks to me like their statutory argument. No. It's their statutory argument of whether it's within the jurisdiction. It's element one. It's prong one of the statute. That's where they spent all their time at the arbitration, fighting about whether it was covered work. They missed the boat. It's a two-prong test. And the question of whether contributions were acquired, as Judge Chang wrote, is referenced by the collective bargaining agreement. And it is remarkable for them, in response to Your Honor's question, to say that it comes from the statute. Because we have it in our briefs. Up and down, they argued to the arbitrator and then to Judge Chang. There's no separate statutory words that are ambiguous. They argued two things. One, there's an amorphous statutory policy, which Your Honor essentially called them on and said, that's not statutory ambiguity. Show me the words that are ambiguous. We still, as of today, we don't have an answer to that question. And then second, it's inconsistent with what they argued throughout. Before the arbitrator, there was never a question of what the statute meant. Their argument was it was covered work and that, therefore, the contract, which they mistakenly asserted was unambiguous, because as night follows day, if we prove it's within the jurisdiction, then contributions are required. That's all they did in the arbitration. They never contested the question of what the statute meant. Well, that may well be right. I don't frankly understand the union's argument that it's ambiguous. I think it's pretty clear. And then, Your Honor, the case is over, because clear air review means it's got to be. No, I think it's clear that the arbitrator got it wrong. There was never an issue tendered to the arbitrator that it got wrong. The only question was what did the agreement say. Everybody agrees the statute requires reference to the collective bargaining agreements. There's no way to interpret the statute without that. We argue to the arbitrator those agreements are ambiguous, and you look at this 10-year course of dealing. They said, well, it's night follows day. It's not ambiguous. So can you direct this to any other situation where courts have had to deal with this kind of selection among available unions and the ñ obviously, no employer wants to wind up having to pay twice, although it can happen. But other situations, because this is a fairly ñ this may be a unique problem, but it's one that does have the problem under the district court's decision of leaving a shortfall that the other employers have to make up if Weiss or Weiss doesn't. Two responses. One, let me cut to the shortfall. This is not an instance where a estoppel or a position by the fund applied to one employer. This was industry-wide. So there's no question of how employers are being treated differently. Every employer got the same message from the fund, based on the undisputed testimony from the fund's representative. So this isn't a case of ñ like in Black where the court in dicta said maybe ñ I'm not talking about the estoppel problem. I'm talking about just the problem of shifting work from ñ that's been divided between two unions and shifting it to one. Okay. That's not between employers, but I understand what you're saying. I was reacting to the employer part. Your Honor, there is a case. It's an opinion letter by the PBGC quoted in H.C. Elliott, the Ninth Circuit case. It's in our briefs. It is PBGC reference 4230B, complete withdrawal. It is ñ I'm sorry. It's 85-5. And what the court says there is what the court in H.C. Elliott was doing. And H.C. Elliott calls on this. And the court says here, under these circumstances, there is no withdrawal unless the employer would have been obligated to make contributions for work performed by subcontractors under the terminated agreement. If contributions would not have been required, there would be no withdrawal because the employer would not be continuing to perform work of the type for which contributions were previously required. In that case in Elliott, Your Honor, the subcontractors are the finishers. In that case, the subcontractors were hired to do the work that the union, that the funds people had previously done. And what H.C. Elliott says is look at the contract to determine whether contributions for those people, the new people, the subcontractors in that case, in this case the finishers, whether contributions for them, for those people, are required. H.C. Elliott said that ñ excuse me. Did the PBGC opinion address a shift between different unions? It was worse than that. It addressed a shift to non-union. And what the court said there was look at the CBA. And if contributions weren't required under the CBA for these non-union folks, then no withdrawal liability. And that's exactly our case, only it's better. Why is it better? Because the fund itself testified that this is how we interpret our agreements. We are interpreting our declaration of trust and our contract to say that if you're paying contributions to another fund's retirement, we are not requiring it from you. And the language of their audits and the language of the testimony is on point to the second element under the statute. And that focuses well, as you want to, on the finishers' work that was being done before the shift in 2009. But the focus of the statute and the problem is on the laborers left behind, in essence. And they were doing work, contributions were required, that work is then shifted to finishers, and that sure looks like a withdrawal to me from the laborers' fund. Your Honor, you are articulating well the policies, what they have argued may be the policies behind withdrawal liability. With all due respect, the language of the statute is clear and unambiguous. There is not a single word in the statute they've claimed is ambiguous. And so Your Honor is much more artfully than they ever did arguing that the policies trump the clear language. No, that's not what I'm suggesting. Let's take a look at the language. Okay. Let's start with the phrase, the type for which contributions were previously required. That would be work being done by the laborers, right? Well, not in this instance because we have a period of time when finishers were doing work in the jurisdiction according to the arbitrator and them before withdrawal. Go back to 2008. Are there laborers doing work for which contributions were previously required? There are both laborers and finishers doing work during that period that they contend is within the jurisdiction. But there are laborers doing that work. Yes, there are. That was work within the jurisdiction of the collective bargaining agreement. Sure. Right? And after 2009, Wyss continues to perform the same kind of work that the laborers had been doing and for which contributions were required, ergo there's a withdrawal. I'm with you until the ergo. The ergo assumes a meaning of the – it assumes as night follows day that contributions, when it says previously required, you're talking about a subset of the workers. You're talking only about the workers for whom the collective bargaining agreement covers them. And that's exactly what the witness said we don't do. So suppose – let me simplify this a little bit. Suppose Wyss had had two different unions doing the same type of work. Which we did for a period. Split 50-50. And then the employer decides, it's kind of a hassle dealing with two different unions for the same kind of work. People are arguing about who gets how much. I'm just going to go with one of them. So we'll cut one out and we'll go forward with the other. Is there a withdrawal with respect to the first union? Your Honor, there's a bunch of additional facts that are present in our case that are relevant to your question. The question in our case is what does the collective bargaining agreement say first and foremost? Because there's no way to read the statute without, in my view, referring to the collective bargaining agreement to answer both questions. Both whether contributions were previously required and whether or not the work was in the jurisdiction. And when you look at the collective bargaining agreement in this case, it's ambiguous. Judge Chang is rock solid on that. There's no answer from the fund. And when it's ambiguous, you look at the course of dealing. And the course of dealing in this case is consisting both of the audits, which are auditing whether Wyss complied with the contribution requirements that are at issue in the case. Those are focusing on the ongoing contributions, right? No, they were retroactive. So audit occurs on day X. I think the first audit was 2011. It swept back, including the period of the Art Institute, when we were working right next to each other. Right, right. But it's not looking at withdrawal liability. Well, it's looking at the question that is essential to withdrawal liability. Were contributions previously required under the collective bargaining agreement? That's what they're auditing. And the answer was unmistakably no. And their own words use, you've paid everything required. It's remarkable. And that's the whole reason I'm attached to the audit. Are you paying what's required? And Congress said, if you paid what was previously required, you're in business. And that's what we did. And that's what we did. I think you're confusing ongoing contribution requirements with withdrawal liabilities. But I won't press the point further right now. With respect, Your Honor, the question isn't just the context. The question is the factual question of whether contributions were previously required. That is a fact question that the statute harkens back to. And the statute says to resolve that fact question, you need to look at the CBA. And there's no answer on that. The CBA did not require them for finishers. And then you need to look at the course of dealing. And with respect, I think the course of dealing answers Your Honor's point. The course of dealing, you could have written a collective bargaining agreement that said, no matter who does the work, if work is being done in the jurisdiction, and you shift it, you're out of luck. That's not what these collective bargaining agreements say, because that's the testimony of the person who interpreted them and implemented them. And even if it were, which it's not, estoppel is a slam dunk. The only argument they had on it. Not exactly. There are all kinds of legal issues concerning estoppel. None of which were raised. None of which were raised. They're all forfeited. The only issue on estoppel and the arbitration is whether or not Peter Weese's witness was testimony was credible. So how did you rely, by withdrawing in 2009, on audit results that came in 2011 and 2013? We were never required. Every month, even separate from the audit, every month we submitted to the laborers fund a, here's who we employ, here's your contribution amounts. Every month we said, check, here's for whom we're making contributions. And there wasn't a peep. The audit was just the exclamation point on what we already knew from our course of dealing with the unit. So the audits don't matter for the estoppel theory? No, it's the exclamation point. Because it covers, the first audit is before the withdrawal. The first audit is 2011. The withdrawal is 2009. No, 2009. 2009 is when the work shifts. If there's a time when the withdrawal statute kicks in, that's it. It's when the statute kicks in, but not when, sorry, I shouldn't be using withdrawal. Weese hadn't terminated the agreement at the time. And so until Weese terminates the agreement, those audit results where they're telling us, you have made all of your required contributions consistent with the policy testified by the man who implements the collective bargaining agreement. We have not spent enough time, in my view, though we've spent a lot of time, on the forfeiture questions. This case, the fund to avoid clear air review has taken remarkable positions. They claim we didn't argue things that we did argue. We have this in the briefs and your time has expired. Yes, I understand. Thank you. If there are any further questions. I think we've exhausted that. Thank you. Ms. Engelhardt. If I may go back to the waiver argument. The district court, the waiver argument was not waived by the funds with respect to the interpretation of the statute. The stipulation, not the Weese brief, includes the issue that was handled at the arbitration. I'm talking about the stipulation of the issue. The stipulated issue was the question that the arbitrator was asked to answer and what the parties put together. It's appendix page 77 in the fund's appendix. That was the issue and it basically incorporated the language of the lengthy 1383B issue. That included whether or not contributions were previously required to be made to the pension fund. The arbitrator answered that issue. The briefs that Judge Hamilton discussed earlier argued all of the answers to that issue and basically focused on the work because the focus on the work is the interpretation with respect to what is previously required and what is currently going on with Weese. They are taking the work that was labor's work and handing it to finishers. The estoppel that Peter Weese apparently relied on, it should not be available here for many reasons. One is the district court didn't reach this decision and so there is no intentional reliance. The way Weese portrayed estoppel in his argument was without even setting out the elements of estoppel. He argued, of course, there should be estoppel without establishing the reliance piece of it. And that, of course, he claimed those audit reports told Weese that they did not owe any representation. The arbitrator found there was no knowing misrepresentation, correct? The... Arbitrator found there was no knowing misrepresentation, correct? She said that. Which we have said is an element of the estoppel defense. Correct. The other reasons is there was a Danova review. Even if the arbitrator didn't reach the statutory question, this court, by reason of MEPA, because the arbitration procedure is different than one merely between labor that are part of a collective bargaining agreement, it's a statutory arbitration procedure. This court is permitted a Danova review of all conclusions of law. So... Well, yes, but subject to waiver and forfeiture rules. Waiver... Right. If the argument wasn't adequately preserved. Oh, correct. Correct. But, well, the arbitrator hadn't made its ruling and once that arbitrator did make its ruling, we made those arguments before the district court. The... And in MEPA arbitrations, it's also important to note that the employer actually has the burden of proof. So the fund will assess the withdrawal liability, send a notice to the employer, in this case, to WIES. And WIES has to raise issues. And in that case, since the employer is the burden of proof, maybe it is not incumbent on the fund to raise the specific argument addressing how the statute is to be interpreted, although we did discuss that at length at the arbitration. I'd also like to identify that, you know, the fund believes that the district court should be reversed on the merits, but if this appeal does not result in a reversal, it should not reverse the denial of attorney's fees and costs in this manner. The funds urge this court to agree that the district court's ultimate decision that the funds were substantially justified is correct. And one is the standard is a modest burden, that attorney's fees and costs were not imposed where the fund was substantially justified in challenging the arbitrator's award. Here, the arbitrator's award is that the activity post-withdrawal forms the basis of whether or not WIES is exempt. And also, I want to address the estoppel question that was raised and discussed, that withdrawal liability is whether or not WIES owes current contributions for work performed by finishers does not relate to whether it owes withdrawal liability for work previously performed by laborers. Going back to that question of the statute is not based on the mixing of a policy that the pension fund has for monthly contributions as to whether the amount incurred by WIES years prior that results in this withdrawal liability should not be paid by the company. Thank you. Alright, thank you very much. Our thanks to both counsel. The case is taken under advisement.